**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLORADO**

| | |
|---|---|
| RILEY CORNELIO, Individually and on Behalf of All Those Similarly Situated, | CASE NO. |
| Plaintiff, | **<u>CLASS ACTION</u>** |
| vs. | **CLASS ACTION COMPLAINT** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; | **JURY TRIAL DEMANDED** |
| Defendant. | |

*"It's the worst part of the job. … I was meeting with kids from East St. Louis once, afraid to make an offer. You're waiting for the sticker shock when you say, 'We really love you but – oh by the way – your family will have to pay $30,000 the first year."*

-Tony Vitello, Head Baseball Coach, University of Tennessee (May 18, 2022).[1]

Plaintiff Riley Cornelio, on behalf of himself and all others similarly situated, brings this class action complaint alleging antitrust violations. Plaintiff alleges as follows:

## INTRODUCTION

1.      Over 25,000 fans were in the sold-out stadium in Omaha for the College World Series finale. They stood on their feet in the last inning as the University of Tennessee attempted to close out a tight game against Texas A&M. Nearly three million more fans watched on ESPN as the last pitch was thrown. The final out was recorded, and the Tennessee players sprinted to the center of the diamond to celebrate the school's first college baseball championship.

2.      For those Tennessee players, it was the 73rd game of their season. Close to half of those games had taken place on the road. The season had begun four months before in February, and practice had begun long before that. The players displayed athletic skills and a level of dedication that had great value to the school. Yet nearly all of those players celebrating that championship were on partial athletic scholarships.

3.      Why? Because of one specific NCAA bylaw—a bylaw that is yet another example of the NCAA's general efforts to deny athletes the value their labor creates. NCAA Bylaw 15.5.4 limits NCAA schools to only offering 11.7 baseball scholarships. But that's not nearly enough players for a college baseball team. These scholarships are spread amongst 27 players (or sometimes 32 in recent

---

[1] *SEC baseball keeps growing, but scholarships don't, Tony Vitello wants more.* Knoxville News Sentinel (May 18, 2022) https://www.knoxnews.com/story/sports/columnists/university-of-tennessee/john-adams/2022/05/18/sec-baseball-keeps-growing-but-scholarships-dont-john-adams/9760907002/.

**CLASS ACTION COMPLAINT**

years), so on average, each player is on a 43% scholarship. No matter the school's resources, and no matter how much a school wants to invest resources in baseball, the limit is the same.

4.      If permitted, NCAA schools would offer more scholarship money to their college baseball players. Certainly the better resourced schools would. The NCAA schools compete for talented baseball players for their baseball teams, and the 11.7 scholarship bylaw is an artificial cap on the amount of scholarship money that schools can provide. As the opening quote makes clear, the rule is harming thousands of baseball players every year.

5.      With the cost of attending college at a record high, the harm is substantial. At some schools with high-level baseball teams, like the University of Miami and Texas Christian University, the total cost of attendance now exceeds $70,000 each year. A talented player on a partial scholarship might be expected to pay $40,000 or more per year to attend one of these schools. Absent the bylaw, those same players would pay nothing because they would be on a full scholarship. Over the course of four years, that means the bylaw is harming many baseball players to the tune of six figures.

6.      These baseball players are not alone, as similar rules affect other sports with partial scholarships. NCAA Bylaw 15.5.3 lists over 30 other sports that are deemed "equivalency sports," meaning that schools make scholarship offers to their athletes in these sports that are not commensurate with what a competitive market would demand.

7.      After years of complaints from coaches about the unfairness of the rule, the NCAA recently announced a plan to scrap the arbitrary rules in the future. The reason is obvious. After years of losing antitrust cases—*see, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010 (10th Cir. 1998)—the NCAA and its members no doubt recognize that the rules are indefensible. Defendant and its members operate as a cartel, and the capping of scholarship money at artificially low levels in these sports results in wage fixing amongst horizontal competitors in a market for services. The anticompetitive effects are as clear as

**CLASS ACTION COMPLAINT**

with any other wage fix, and it is an unlawful restraint under Section 1 of the Sherman Act, 15 U.S.C. § 1.

8.      Even if the rule is finally repealed, there will still be a need to make whole the athletes who suffered. Years of antitrust harm cannot be undone simply with the striking of a rule that already damaged thousands of athletes. And for now, of course, the rule persists and the harm continues.

9.      This suit seeks to ensure that the NCAA and its members follow through on the promise of eliminating this rule, and to recover the damages caused by their collusive and illegal practices.

## PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff Riley Cornelio, an individual, is a resident of Colorado. He worked as a college baseball player at Texas Christian University from 2019 to 2022.

11.     Defendant NCAA is an unincorporated association that maintains its principal place of business in Indianapolis, Indiana. It has approximately 1,100 member schools. Its membership includes the public and private universities and colleges that conduct major athletic programs in the United States.

12.     Various other persons and entities engaged in concert with the named Defendant in the conduct alleged herein, and are co-conspirators.

13.      Plaintiff brings this class action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of §§ 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

14.     Defendant's conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce. Defendant and its member schools transact substantial business in multiple states. Defendant and its member schools routinely use instruments of interstate

**CLASS ACTION COMPLAINT**

commerce, such as interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to carry out their operations.

15.     Venue is proper in this District because Defendant and some of its members reside, are found, and have agents in this District as provided in 28 U.S.C. § 1391(b) and (c) and in § 4 of the Clayton Act, 15 U.S.C. § 15. Alternatively, venue is proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendant and some of its members can be found in this District or transact business in this District. A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. The bylaws at issue (discussed in greater detail below) apply to athletes who have worked, or currently work, for NCAA member institutions in this District, the NCAA sanctions Division I events that regularly take place in this District, including games played by local members, and Plaintiff and other members of the proposed Class entered into agreements, reside, or work in this District. Also, last year, Denver hosted a portion of the NCAA's popular March Madness men's basketball tournament, and it will do so again in 2025.

16.     This Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, for the same reason that venue is proper under the Clayton Act, as described *supra*. The Court also has personal jurisdiction because, among other things, Defendant transacts substantial, continuous business in this State and District; participates in organizing intercollegiate athletic contests that take place in this State and District, as well as licensing and selling merchandise and products in this State and District, and profiting from televising NCAA-sanctioned events that take place in this State and District; it has substantial contacts in this State and District and several of its members reside in this State and District; and it is engaged in an illegal anti-competitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, or doing business throughout the United States, including in this State and District.

**CLASS ACTION COMPLAINT**

## CLASS ACTION ALLEGATIONS

17.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, as a class action on behalf of the following:

> All persons who received partial scholarships at an NCAA Division I school that is or was a member of one of the Power Five Conferences during the relevant time period, or at the University of Notre Dame, in the sports delineated in NCAA Bylaws 15.5.3, 15.5.4 (baseball) and 15.5.7 (hockey) from the beginning of the statute of limitations period, as determined by the Court, through judgment in this matter.

18.    While Plaintiff does not know the exact size of the proposed class, the proposed class includes well over 100 members residing in various parts of the United States. The class is so numerous that joinder of all members is impracticable.

19.    Plaintiff's claims are typical of the claims of other members of the proposed class. Plaintiff and the members of the Proposed Class were subject to the same or similar restraints and compensation practices arising out of Defendants' common course of illegal conduct. Plaintiff and the Proposed Class have sustained similar types of damages as a result of these common practices.

20.    Common questions of fact or law exists, and they predominate over any individualized questions. They include, *inter alia*:

a.    Whether by enacting the bylaws, Defendant engaged in a contract, combination, or conspiracy to unreasonably restrain trade by capping the amount of scholarship compensation paid to class members;

b.    Whether that conduct caused Plaintiff and proposed class members to earn less of a scholarship than what they would have in a truly competitive market;

c.    Whether Plaintiff and the proposed class suffered antitrust injury or were threatened with injury; and

d.    Whether Plaintiff and the proposed class are entitled to damages and injunctive relief, and the type and scope of that relief.

**CLASS ACTION COMPLAINT**

21.     Plaintiff will fairly and adequately protect the interests of class members in that their interests are aligned, and Plaintiff has retained counsel competent and experienced in class-action litigation, including antitrust litigation and sports-related litigation.

22.     A class action is superior to other methods of adjudication. Joinder is impracticable, and the prosecution of separate actions by individual class members would impose heavy burdens upon the courts and Defendant and create a risk of: (a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendant; and (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

23.     Conversely, a class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result. Plaintiff does not anticipate any difficulty in the management of this action as a class action, and the proposed class has a high degree of cohesion.

## FACTUAL ALLEGATIONS

### A. The NCAA, its co-conspirators, and the anticompetitive restraint at issue.

24.     The NCAA is an unincorporated association governed by its members, which include its schools and conferences. The NCAA has several governance committees, with representatives from member schools and conferences who sit on the committees and engage in the NCAA legislative process. The highest governing body, the Board of Governors, consists primarily of chancellors and presidents of member schools, and it also employs the NCAA's president and adopts and implements policies.

25.     The association has adopted a constitution and a number of bylaws. As a condition of membership, member schools and conferences must comply with the association's constitution and bylaws. The bylaws are enacted and amended through the NCAA's legislative process.

**CLASS ACTION COMPLAINT**

26.     The NCAA bylaws distinguish between "head-count" sports and "equivalency" sports.

27.     In head-count sports, the NCAA bylaws allow for a number of scholarships that must be awarded to the same number of athletes. Every athlete that is on an athletic scholarship in a head-count sport receives a full scholarship. The Division I head-count sports are men's and women's basketball, football, women's gymnastics, women's tennis, and women's volleyball.

28.     In equivalency sports, by contrast, the NCAA bylaws allow for a set number of scholarships that are to be divided amongst a number of athletes that is greater than the number of scholarships; i.e., the set number is divided amongst the athletes, resulting in most of the athletes in equivalency sports (and sometimes all of them) receiving only a partial scholarship. The equivalency sports in Division I are all the other Division I sports that are not mentioned in the preceding paragraph.

29.     NCAA Bylaw 15.5.3.2 provides the rule for computing equivalencies: "each institutional financial aid award to a[n] [athlete] shall be computed" by counting "all institutional aid (per Bylaw 15.02.5.2) received up to the full grant-in-aid" for each athlete, with a fraction then created by using the "amount received" by the athlete as the numerator and the "full grant-in-aid value" for the athlete as the denominator. The "sum of all fractional and maximum awards received by [athletes] shall not exceed the total limit for the sport in question for the academic year as a whole."

30.     NCAA bylaws 15.5.3.1 and 15.5.3.2 set forth the scholarship limits for most of the equivalency sports. Thirteen men's sports are listed, and 19 women's sports.

31.     NCAA Bylaw 15.5.4 sets forth the scholarship limit for baseball: "There shall be an annual limit of 11.7 on the value of financial aid awards (equivalencies) to counters and an annual limit of 27 on the total number of counters in baseball." (A counter is an athlete receiving at least a

**CLASS ACTION COMPLAINT**

partial scholarship.) Further, a university must "provide each counter" in baseball a scholarship "that is equal to or greater than 25 percent of an equivalency."

32.     NCAA Bylaw 15.5.7 sets forth the scholarship limit for ice hockey: "There shall be an annual limit of 18 on the value of financial aid awards (equivalencies) to counters and an annual limit of 30 on the total number of counters in ice hockey at each institution."

33.     The NCAA, its conferences, and its member schools make and enforce these rules. If a member school violates the rules, the NCAA's governing constitution calls for disciplinary measures for the members and the athletes involved. Per Article 3.2 of the NCAA's governing constitution, a condition of membership in the NCAA is the agreement by a school to administer its agreements in accordance with the NCAA's rules. The member conferences likewise must comply with all the association's rules and regulations. And active members must refrain from competing in athletic contests with other schools who are found to be out of compliance. That is a quintessential way of enforcing a cartel's rules: through an agreement to punish and boycott an entity that fails to follow the rules.

34.     The limits set forth in these bylaws are all horizontal caps amongst competitors that artificially fix the scholarship money being offered to talented college athletes. This results in wage fixing because it artificially caps the compensation going to a group of workers. It is codified in Defendant's own bylaws, and it does not exist in other collegiate contexts. Universities have not colluded together to ensure that talented young mathematicians or musicians only receive partial scholarships. Neither should schools be permitted to collude to ensure that talented baseball players and other athletes receive only partial scholarships.

35.     The relevant bylaws are found in the NCAA's manual for Division I athletics. The NCAA is divided into three levels: Division I, Division II, and Division III. Division I schools generally have the largest athletics department budgets and often have larger student bodies. There are more than 350 Division I schools. Sixty-nine of these Division I schools make up the Power 5

**CLASS ACTION COMPLAINT**

Conferences. Notre Dame (which, though independent in football, competes against Power 5 schools and is a member of the ACC for baseball and many other sports) also operates at the Division I level.

36.    College sports at the Division I level have enjoyed tremendous revenue growth over the last two decades. In 2023, the NCAA itself earned $1.3 billion. That does not include the amount earned by the NCAA's members individually. "Division I institutions reported total revenue of almost $17.5 billion on athletics in 2022."[2]

37.    Much has been written about the revenue generated by college basketball and football in recent decades, but other sports have flourished as well. Take college baseball. In 2022, the University of Arkansas drew an average of 10,376 fans to each home baseball game, for a total of 363,153 fans. That narrowly edged out Louisiana State University's baseball team, which drew an average of 10,365 fans per game and a total of 362,759.

38.    By comparison, the University of Arkansas men's basketball team—also a top-level and popular program—drew less than 300,000 fans in a recent year, meaning that University of Arkansas's college baseball team drew more total fans than its college basketball team (though college baseball plays more games per year than basketball).

39.    In 2024, Arkansas was no longer the attendance leader for baseball. Mississippi State instead took that crown by averaging 10,906 fans per game.[3] Louisiana State was second at 10,834, and Arkansas third. Each of the three schools exceeded 370,000 attendees over the course of the 2024 season.

40.    At the end of each season, the NCAA hosts a baseball tournament that begins with 64 teams. Teams play the first round at 16 regional sites. The winner of each regional advances to

---

[2] https://ncaaorg.s3.amazonaws.com/research/Finances/2023RES_DI-RevExpReport_FINAL.pdf.

[3] https://247sports.com/college/mississippi-state/article/mississippi-state-baseball-leads-ncaa-in-campus-attendance-232857113/

NO.

**CLASS ACTION COMPLAINT**

one of eight super regional series. These super regionals are usually well attended; in 2021, one of the eight super-regional series drew 40,140 fans over three games, for an average of 13,380 fans per game. The games are also broadcast on television.

41.     The eight winners of the super regionals then advance to the College World Series, which is hosted by the NCAA. The 2024 event drew an average of 24,788 fans per game, with an overall attendance of 371,820 for the entire series.[4] The games aired on ESPN's channels, with the decisive game averaging 3.34 million viewers. ESPN contracted for the right to air the College World Series games as part of a $500 million broadcast deal that also gives ESPN the broadcast rights for college softball and other NCAA championship events.

42.     Aside from baseball, other sports are well attended as well. The University of North Dakota's men's hockey team averaged over 11,000 fans per game in 2024 and had 20 sellouts. The University of Wisconsin was not far behind at over 10,000 fans per hockey game. The NCAA's hockey championship game drew over 18,000 fans and was aired on ESPN2. Not to be outdone, the NCAA's Women's College World Series for softball averaged over 12,000 attendees, and 1.6 million viewers on ESPN's networks. And in 2023, the University of Nebraska's volleyball team set a record by having *92,003* fans attend a game at the school's football stadium.

43.     The schools in the Power 5 Conferences generate much of the overall revenue. In 2022-23, there were at least 22 universities with revenues exceeding $150 million. (Private schools like Duke and Notre Dame were not included in the study, meaning the number of such schools is likely higher.) All those schools were members of Power 5 Conferences. In 2022, the 13 public schools in the SEC reported a combined revenue of $2.17 billion, and the 13 public schools in the Big Ten combined for $2.04 billion in revenue.[5] On the low end, the average athletics department

---

[4] https://www.saturdaydownsouth.com/college-baseball/college-world-series-attendance-record-broken-by-2024-cws/

[5] https://www.usatoday.com/story/sports/college/2023/06/14/sec-big-ten-2-billion-athletics-revenue-power-five/70313053007/

NO.

**CLASS ACTION COMPLAINT**

revenue for a Big 12 school amounted to over $110 million in 2022. On the high end, the average revenue for a SEC school amounted to $159.1 million. The other three conferences in the Power 5 fell between those numbers.

44.    In recent years, several schools have switched conferences as they chase more money. For instance, most members of the Pac-12 have decided to abandon the conference to cash in on more lucrative television deals being negotiated by other Power 5 conferences. The Big Ten—traditionally a Midwestern conference—will now include UCLA, USC, Washington, and Oregon as members.

45.    Similarly, the ACC traditionally has been a conference of eastern schools. Now the "Atlantic Coast Conference" will include members from the Pacific coast: Stanford and California-Berkeley. Instead of playing games a few hours south against USC or UCLA, the athletes at Stanford will have to travel cross-country to Boston, Chapel Hill, and Miami on a regular basis.

46.    The NCAA and its members have long fussed about the need to protect athletes, but they apparently have no problem with increasing the players' travel dramatically or, at times, expanding the number of games scheduled to increase revenue. Player welfare is taking a backseat to revenue. The increased travel caused by realignment hits athletes in sports other than basketball and football particularly hard. One head football coach put it this way: "[W]hat about softball and baseball who have to travel cross-country? Did we ask about the cost to them? Do we know what the number one cause of mental health [problems] is: it's lack of rest and sleep."[6]

47.    Or as a head basketball coach stated: "None of it is in the best interest of the student-athlete, no matter what anybody says."[7]

---

[6] Jared Bush, *Mizzou head coach Eli Drinkwitz criticizes conference realignment*, Fox4, Aug. 6, 2023, *available at* https://fox4kc.com/sports/college/mizzou/mizzou-head-coach-eli-drinkwitz-criticizes-conference-realignment/.

[7] Jordan Mendoza, *UCLA coach Mick Cronin: Realignment not 'in the best interest of the student-athlete'*, USA Today, Aug. 17, 2023, *available at* https://www.usatoday.com/story/sports/ncaab/2023/08/17/ucla-coach-mick-cronin-realignment-

**CLASS ACTION COMPLAINT**

48.     The administrators and head coaches and nearly everyone else working in college athletics have seen salaries rise along with revenue. In 2024, five SEC baseball coaches made $1.5 million or more, with Vanderbilt's coach leading the way at nearly $2 million.[8] Similarly, Oklahoma's softball coach earns $1.625 million annually.[9] And in Maine, the university's hockey coach is the highest paid public employee.[10]

49.     Meanwhile many of the players on these teams are on just partial scholarships—having to pay much of the cost of college despite playing in front of thousands of fans each game and even though their coaches are making hundreds of thousands and sometimes millions of dollars. That is solely because of Defendants' illegal restraint, which arbitrarily caps the scholarships in these sports in a way that forces schools to offer partial scholarships to athletes.

50.     Given the amount of work performed by these athletes and the revenue earned by NCAA member schools off their backs, a full scholarship is well earned. Being a college athlete at the Division I level is akin to having a full-time job. The athletes often work six days a week with long hours of travel when going to away games, and frequently work over 40 hours per week. Even during the "off-season," the work is substantial. The schools control much of their daily activities from the moment the athletes wake up. Athletes give much of their collegiate lives to these universities, and they should not be suffering financial losses and taking out student loans as a result of an arbitrary, anticompetitive rule.

51.     Absent the restraint, the athletes in the proposed class would be receiving more scholarship money. The schools in the relevant conferences compete with each other for talented

thoughts/70615325007/.

[8] https://www.tennessean.com/story/sports/college/SEC/2024/05/21/sec-baseball-coaching-salaries-2024-tim-corbin-jay-johnson-kevin-osullivan/73666535007/

[9] https://justwomenssports.com/reads/ncaa-softball-patty-gasso-contract-record/

[10] https://www.bangordailynews.com/2024/02/07/sports/maine-will-be-the-only-state-with-a-hockey-coach-as-its-highest-paid-public-employee/

NO.

**CLASS ACTION COMPLAINT**

athletes, and in a truly competitive market, that competition would lead to the schools increasing the scholarship money available to these athletes. If given the choice, Mississippi State, with its average of nearly 11,000 fans per baseball game, would give every baseball player a full scholarship, and other schools would follow. The same can be said for North Dakota's men's hockey team and the hockey schools they compete against. But they can't. They're bound by the NCAA's cartel-like rules, and the athletes are suffering as a result.

**B.  The NCAA's prior antitrust losses.**

52.     This is not the first antitrust case brought against Defendants. Just three years ago, the Supreme Court ruled against the NCAA in a case brought by athletes seeking greater compensation. As the Court wrote, "Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 73 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104, n. 27 (1984)). The Court held that the NCAA could not limit education-related compensation paid to its athletes, such as "limiting scholarships for graduate school, payments for tutoring, and the like." *Id.* at 103.

53.     In his concurrence, Justice Kavanaugh issued a warning to the NCAA regarding its "remaining compensation rules," like "rules [that] generally restrict student athletes from receiving compensation or benefits from their colleges for playing sports." *Id.* at 108. Those "rules also raise serious questions under the antitrust laws." *Id.* He wrote that the "NCAA's business model would be flatly illegal in almost any other industry in America." *Id.* at 109. "Price-fixing labor is price-fixing labor," he explained, and it is a "textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 110.

54.     "Businesses like the NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product." *Id.* at 110. That the NCAA has

NO.

**CLASS ACTION COMPLAINT**

done so for decades does not excuse the behavior. It simply makes it more egregious and makes change long overdue.

**C.  The NCAA has no procompetitive justifications for the restraint.**

55.     The NCAA has traditionally defended its antitrust cases by pointing to the need to preserve a tradition of "amateurism." That concept has always been a moving target, reconceptualized on an ad hoc basis to suit the NCAA's anticompetitive ends. *See Alston*, 594 U.S. at 101 ("While the NCAA asks us to defer to its conception of amateurism, the district court found that the NCAA had not adopted any consistent definition.").

56.     But the "amateurism" defense has no place in this case regardless. Defendant has long allowed athletes to be paid in the form of scholarships in return for their labor, so there is no justification for forcing some athletes to work for less scholarship money than they would otherwise receive in a competitive market while other athletes can work for full scholarships in other sports. The decision to place an artificially low cap in certain sports is arbitrary and unnecessary and has no procompetitive justification.

57.     It certainly is not needed for purposes of competition. The better-resourced schools already find ways to outcompete less-resourced schools. That is seen in the salaries of coaches discussed above. The schools with more resources generally pay higher salaries to coaches, and provide their coaches with more staff members. Why? Because it helps them recruit athletes, and ultimately helps them to compete.

58.     The same can be said about investments into facilities. How did Mississippi State leapfrog Arkansas in college baseball attendance? In part because they invested $68 million into a new stadium. Other schools are making similar investments. The University of Tennessee is re-building its baseball stadium at a cost of over $95 million. Oklahoma State did a $60 million renovation of its baseball stadium not long ago. Many others have followed along—or they are

planning to do so. They did so not only to draw more fans to games, but to also attract high-level recruits to their schools.

59.     Absent this bylaw, these schools would also compete for these athletes by offering more scholarship money. Antitrust laws demand competition in a labor market, but the NCAA and its members have colluded to stifle that competition. That amounts to a horizontal restriction amongst competitors that runs afoul of antitrust laws.

**D.  The market at issue.**

60.     The NCAA's Division I is the highest level of competition in college sports. That has created a nationwide labor market for college sports within the Division I segment. By creating a separate Division I with rules that are distinct from Divisions II and III, the NCAA has recognized that the lower divisions are not reasonable substitutes for Division I.

61.     Division I schools spend more on facilities and coaches and generally compete against each other for athletes. Meanwhile, the NCAA and its Division I members can control (and suppress) the price paid in this labor market for college athletes. They have in fact done so by passing the bylaws at issue in this case and strictly enforcing them. Those bylaws have had the very real effect of decreasing scholarship money below what would have been paid to these athletes in an unrestrained, competitive market.

62.     The district court in *Alston* defined the market as one "for Plaintiffs' labor in the form of athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1097 (N.D. Cal. 2019). The court found:

> Because of the absence of any viable substitutes for Division I basketball and FBS football, Defendants hold monopsony power in all of these markets and exercise that power to cap artificially the compensation offered to recruits. This is reflected in the high degree of concentration found in the relevant market. Class members cannot obtain the same combination of a college education, high-level television exposure, and opportunities to enter professional sports other than from Division I schools.

NO.

**CLASS ACTION COMPLAINT**

*Id.*

63.     The district court remarked there that the NCAA did not challenge that market at summary judgment. *Id.* And as the Supreme Court stated, Defendants did "not contest that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor." *Alston*, 594 U.S. at 86.

64.     That the athletes agree to these conditions shows the market power that the NCAA and its members collectively possess. For an elite athlete, there is no reasonable substitute that combines the educational and athletic opportunities offered in the labor market at the Division I level. The other divisions do not offer the same level of competition, do not offer the same number of scholarships, do not offer the same amount of television exposure, and generally do not have as highly regarded coaches or athletic facilities. The same can be said for the National Association of Intercollegiate Athletics or junior colleges' athletic programs.

65.     Also, college sports offer different opportunities than professional sports leagues by allowing athletes to receive a college education while working at the schools. And only a small number of college athletes eventually work in professional sports leagues.

**E.  The effect of Defendant's illegal conduct on Plaintiff Riley Cornelio.**

66.     Plaintiff Riley Cornelio worked as college baseball player at Texas Christian University ("TCU") from 2019 to 2022.

67.     He was a highly recruited prospect out of high school who possessed unique talent. He was ranked as the number one baseball recruit in the state of Colorado during his senior year of high school and was named the Colorado Player of the Year by both Perfect Game and Gatorade.

68.     While a resident of Colorado, he was recruited by TCU and was offered a partial scholarship. He accepted that partial scholarship offer while residing in Colorado. But for the

NO.

**CLASS ACTION COMPLAINT**

NCAA rule restricting baseball scholarships to 11.7, TCU would have offered him more scholarship money.

69.     TCU prides itself on having a top baseball program; its games are well-attended; and it competes for high-level recruits like Mr. Cornelio. To remain competitive, and absent the NCAA's restrictions, TCU would increase the scholarship money going to athletes, including baseball players.

70.     The labor provided by Mr. Cornelio was of great value to Defendant and its member, TCU. And it was a significant amount of labor. During the season, he often worked six days per week, and often more than 40 hours per week. Even during the offseason, he worked a significant number of hours under the direction of the coaches at the school.

71.     His job as a college baseball player was essentially a full-time one, and it had great value. During his career, Mr. Cornelio was a key member of TCU's team. He started several games in his first two years at TCU. By his third year, in 2022, he led TCU in games started as a pitcher and tallied a team-high 77 strikeouts. He was named a 2nd-Team All-Big 12 selection and 1st-Team Academic All-Big 12 selection in 2022. Following that season, he was selected in the seventh round of Major League Baseball's draft by the Washington Nationals.

72.     During his time at TCU, the games he played in were usually televised, often by either an ESPN network or another network. An average of around 4,000 fans per game attended TCU's home games. In 2021 and 2022, TCU baseball was one of 64 teams selected to compete in an NCAA regional—the postseason event that allows teams to attempt to advance to the College World Series. In 2021, they were selected to host one of the 16 regionals.

73.     Mr. Cornelio only received a partial scholarship due to the NCAA's baseball scholarship bylaws. That collusive, artificial restraint greatly harmed Mr. Cornelio. It prevented him from enjoying the benefit of bargaining for scholarship money in a competitive environment, forcing him to pay thousands of dollars that he would not have otherwise had to pay. Tuition and expenses at TCU neared $60,000 in 2022, and the full cost of attendance was much more when

taking into account room and board and other costs. The costs during other years that he attended were also very high.

74.     But for the illegal and unfair restraints put in place, he would have received a greater amount of scholarship money than he received. Thus, Defendants' scheme directly injured him.

### COUNT I – Violations of Sections 1 & 3 of the Sherman Act
### (Brought by Plaintiff on Behalf of the Class)

75.     Plaintiff repeats, re-alleges and incorporates by reference the preceding paragraphs of this Complaint as if more fully set forth herein.

76.     Defendant and others entered into and engaged in unlawful agreements in restraint of the trade and commerce described above. These actions violated and continue to violate Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3. Since at least four years before the filing of this action, the trusts formed by Defendant's cartel has restrained trade and commerce in violation of Sections 1 and 3 of the Sherman Act, and the behavior continues today.

77.     This combination and conspiracy by Defendant (which wholly controls the relevant market) has resulted in, and will until restrained continue to result in, anti-competitive effects, including *inter alia*: (a) fixing the scholarship money that Plaintiff and the Proposed Class received at artificially low levels, since Plaintiff and class members have been unable to negotiate for scholarship money in a free market; and (b) eliminating or suppressing, to a substantial degree, competition among Defendant's member schools when it comes to the scholarship money paid for skilled labor in the market.

78.     As a direct and proximate result of Defendant's combinations and contracts to restrain trade, suppress compensation, and eliminate competition for skilled labor, Plaintiff and members of the Proposed Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Absent Defendant's rules, Plaintiff and Proposed Class Members would have received more scholarship money in exchange for their services.

**CLASS ACTION COMPLAINT**

79.     As a result, Plaintiff and the Proposed Class have suffered damages in an amount to be proved at trial.

80.     Defendant's agreements or conspiratorial acts were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of Defendant's affairs.

81.     Defendant's agreements or conspiracies have no procompetitive effect or purposes, or alternatively, even if they did, substantially less restrictive alternatives can be implemented to achieve any purported procompetitive objectives that Defendant might prove.

82.     Plaintiff and the Proposed Class seek treble damages caused by Defendant's violations of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees.

**Prayer for Relief**

WHEREFORE, Plaintiff, on his own and on behalf of all other similarly situated persons, seeks the following relief:

- Certification of the Proposed Class, as set forth above, pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- A finding that Defendant has violated Sections 1 and 3 of the Sherman Act by engaging in an illegal trust, contract, combination, or conspiracy, and that Plaintiff and class members have been damaged and injured in their business and property as a result of this violation;

- A finding that the alleged combinations and conspiracy be adjudged and decreed as violations of the Sherman Act;

- Actual damages in an amount to be determined at trial;

- Treble damages awarded under the Sherman Act to Plaintiff and class members for the damages sustained by them as a result of Defendant's conduct;

**CLASS ACTION COMPLAINT**

- Judgment entered against Defendant for the amount to be determined and as permitted by law and equity;

- Designation of Plaintiff as class representatives and designation of counsel of record as Class Counsel;

- Pre-judgment and post-judgment interest as permitted by law;

- A declaratory judgment that the practices complained of herein are unlawful;

- Reasonable attorneys' fees and costs of the action;

- Reasonable incentive awards for the Plaintiff;

- Such other relief as the Court shall deem just and proper.

**Demand for Jury Trial**

Pursuant to Federal Rule of Civil Procedure Rule 38(a), Plaintiff demands a jury trial as to all issues triable by a jury.


DATED: August 6, 2024

By: _/s/ Garrett Broshuis_

STEPHEN M. TILLERY
stillery@koreintillery.com
GARRETT R. BROSHUIS
gbroshuis@koreintillery.com
STEVEN M. BEREZNEY
sberezney@koreintillery.com
**KOREIN TILLERY, LLC**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
Facsimile: (314) 241-3525

CHRISTOPHER M. BURKE
cburke@koreintillery.com
**KOREIN TILLERY, LLC**
401 West A. Street, Suite 1430
San Diego, CA 92101
Telephone: (619) 625-5620

**CLASS ACTION COMPLAINT**

ERIC OLSON
eolson@olsongrimsley.com
SEAN GRIMSLEY
sgrimsley@olsongrimsley.com
JASON MURRAY
jmurray@olsongrimsley.com
**OLSON GRIMSLEY KAWANABE**
**HINCHCLIFF & MURRAY LLC**
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151


*Attorneys for Plaintiff*

**CLASS ACTION COMPLAINT**